IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND



| | | |
|---|---|---|
| JAMES G. ROBINSON, et al. | * | |
| | * | |
| v. | * | Civil No. JFM-98-4168 |
| | * | |
| GEO LICENSING COMPANY, L.L.C., et al. | * | |
| | * | |
| | ***** | |
| | * | |
| THOMAS W. GLYNN., et al. | * | |
| | * | |
| v. | * | Civil No. JFM-99-1956 |
| | * | |
| GEOPHONE COMPANY, L.L.C. | * | |
| | * | |
| | ***** | |

MEMORANDUM

James Robinson has filed suit against Thomas Glynn, Glynn Scientific, Inc. ("GSI"), and GeoPhone Company, LLC.[1] Robinson alleges that Glynn committed common law fraud and violated 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5, and Md. Code Ann., Corps. & Ass'ns §§ 11-301, 11-703. Robinson also alleges that Glynn, GSI, and GeoPhone Company, LLC breached a contract between the parties. Glynn and GSI have filed for summary judgment on all claims. For the reasons stated below, I will dismiss Robinson's federal securities law claim. I will also

---

[1] Robinson and Glynn are both residents of Maryland. GeoPhone is a Delaware limited liability company with its principal place of business in Baltimore County, Maryland. GSI is a Maryland corporation with its principal place of business in Anne Arundel County, Maryland.

decline to exercise supplemental jurisdiction over the remaining state law claims.

I.

In 1995, Glynn organized GeoPhone Corporation ("GeoPhone Corp") to sell the GeoPhone telecommunications system ("GeoPhone system"). The GeoPhone system was designed around a revolutionary signal processing technology called Convolutional Ambiguity Multiple Access ("CAMA"). Glynn was the majority shareholder and chairman of GeoPhone Corp. In September 1995, GeoPhone Corp became GeoPhone Company, LLC ("GeoPhone").

In March 1995, Glynn arranged to meet with Robinson in an effort to raise capital for GeoPhone. Over the next several months Glynn attempted to convince Robinson to invest in GeoPhone. During this time, Glynn explained the CAMA technology and how it gave the GeoPhone system a competitive edge in the telecommunications industry. In July 1995, Robinson loaned Glynn $1 million to perform a field test of the GeoPhone system and the CAMA technology.

In August 1995, Glynn and Robinson executed a contract called the "Letter of Intent" ("LOI"). Under the LOI, Robinson promised to invest up to $25 million in GeoPhone if the field test proved that CAMA and the GeoPhone system worked. The $25 million investment was to be comprised of Robinson's $1 million loan, an immediate $14 million investment, and a later $10 million investment. This investment was to be converted into equity in GeoPhone. In October 1995, GeoPhone engineers conducted the field test. The test was successful in some respects, but the engineers did not use CAMA in the demonstration terminals. Nonetheless, Glynn allegedly told Robinson that the field test was a complete success.

In December 1995, Robinson and GeoPhone executed the Agreement to Purchase

Membership Interests in GeoPhone ("APMIG"). Under the APMIG, Robinson agreed to convert $15 million (his $1 million loan and immediate $14 million investment) into equity and to later invest $10 million more. The members of GeoPhone also entered the Amended and Restated GeoPhone Operating Agreement ("ARGOA"). The ARGOA, among other things, detailed the capital contribution, share ownership, and management structure of GeoPhone. Robinson received 33,333 of GeoPhone's 133,333 shares. Robinson was also appointed to the board of managers and the company's executive committee and was named treasurer.

In April 1996, Robinson sued Glynn in Maryland state court. In that suit, Robinson alleged breach of fiduciary duty, fraud, and conversion, all allegedly due to Glynn's mismanagement of GeoPhone funds. In October 1997, the parties settled the state action. As part of the settlement, the parties entered the Membership Interests Purchase Agreement ("MIPA"). Under the MIPA, Robinson agreed to purchase all of Glynn's shares in GeoPhone. The parties also executed a mutual release of all known claims.

In 1998, Robinson allegedly learned for the first time that the CAMA technology was never implemented in the GeoPhone system. In December 1998, Robinson filed suit in this court. In April 1999, Robinson amended his complaint. In July 1999, he filed a second amended complaint. In the second amended complaint, he alleges violations of federal and state securities laws, fraud, and breach of contract. Glynn has also filed a declaratory judgment action against GeoPhone. Glynn seeks indemnification and contribution from GeoPhone for Robinson's claims. This claim was originally filed in Maryland state court, then removed and consolidated with the suit Robinson brought against Glynn. Subject matter jurisdiction over these claims is assertedly based on federal question and supplemental jurisdiction. 28 U.S.C. §§ 1331, 1367(a).

II.

A.

In order to establish a claim under Rule 10b-5, a plaintiff must prove fraud in connection with the purchase of securities. 17 C.F.R. § 240.10b-5. 15 U.S.C. § 78c(a)(10) defines a security as "any note, stock, treasury stock, security future, bond, debenture, . . . [or] investment contract . . . ." Robinson argues that his membership interests in GeoPhone are an "investment contract." (Robinson Opp'n at 39-42.) For the reasons discussed below, however, Robinson's investment in GeoPhone is not an investment contract. As a result, Robinson lacks standing to sue under the federal securities laws.

The Supreme Court defined "investment contract" in SEC v. W.J. Howey Co., 328 U.S. 293 (1946). In Howey, the Supreme Court wrote, "an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party . . . ." Id. at 298-99. Thus, an investment contract has four elements: (1) an investment of money, (2) in a common enterprise, (3) with an expectation of profits, (4) derived solely from the efforts of others. See Teague v. Bakker, 35 F.3d 978, 986 (4th Cir. 1994). See generally 1 Thomas Lee Hazen, The Law of Securities Regulation § 1.6[2], at 63-73 (4th ed. 2002). Glynn only challenges the presence of the fourth element—whether Robinson expected profits solely from the efforts of others.

The requirement that profits are to be derived "solely" from the efforts of others is not to be interpreted literally. Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc., 840 F.2d 236, 240 n.4 (4th Cir. 1988). "[A] program requiring some effort from the investor may still

-4-

constitute an 'investment contract,' but the most essential functions or duties must be performed by others and not the investor." Bailey v. J.W.K. Properties, Inc., 904 F.2d 918, 920 (4th Cir. 1990).[2] To determine whether the most essential functions of an enterprise are performed by others, I must analyze the "economic realities" of the enterprise. See United Hous. Found., Inc. v. Forman, 421 U.S. 837, 851-52 (1975); Bailey, 904 F.2d at 921.

Other federal district courts considering whether LLC membership interests are investment contracts have focused on the LLC's operating agreement to determine the LLC's "economic realities." In Great Lakes Chem. Corp. v. Monsanto Co., 96 F. Supp. 2d 376 (D. Del. 2000), the District Court for the District of Delaware analyzed an operating agreement that gave an LLC's members authority to remove any manager without cause and to dissolve the company, but not to manage the company. The court concluded that the interests were not investment contracts because the member's "authority to remove managers gave it the power to directly affect the profits it received . . . ." Id. at 392. In Keith v. Black Diamond Advisors, Inc., 48 F. Supp. 2d 326 (S.D.N.Y. 1999), the District Court for the Southern District of New York considered an operating agreement that gave members the rights to manage the company,

---

[2]In the leading case Long v. Shultz Cattle Co., 881 F.2d 129 (5th Cir. 1989), the Fifth Circuit described the fourth element of the Howey test as follows:
> It is axiomatic in federal securities law that in order to give effect to the remedial purposes of the Acts, substantive "economic realities" must govern over form. Consequently, in order to ensure that the securities laws are not easily circumvented by agreements requiring a "modicum of effort" on the part of investors, the word "solely" in the [fourth] prong of the Howey test has not been construed literally. The critical inquiry is instead whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.

Id. at 133 (internal quotation marks and citations omitted); see also SEC v. Glenn W. Turner Enters., Inc., 474 F.2d 476, 482 (9th Cir. 1973).

participate in a cash flow distribution structure, and call meetings. The court found that the members' interests were not investment contracts because the members' "level of control [was] antithetical to the notion of member passivity required under the fourth prong of Howey." Id. at 333; see also Nelson v. Stahl, 173 F. Supp. 2d 153, 165 (S.D.N.Y. 2001) (finding that interests in an LLC that granted its members the authority to manage the company were not investment contracts).[3] See generally 1 Hazen, supra, § 1.6[11], at 93-95 ("[W]hen the limited liability company members have a significant say in the management of the business, those membership interests will not be securities.").[4]

In this case, the GeoPhone operating agreement demonstrates that Robinson's interests

---

[3] Robinson cites SEC v. Parkersburg Wireless LLC, 991 F. Supp. 6 (D.D.C. 1997), and K.F.C. Ventures, LLC v. Metaire Med. Equip. Leasing Corp., No. 99-3765, 2000 WL 726877 (E.D. La. June 5, 2000), in support of his argument that "courts routinely have held that membership interests in LLCs, like GeoPhone, are 'securities' subject to securities laws." (Robinson Opp'n at 39.) Both cases, however, follow the principles outlined above and are factually distinguishable from this case. In Parkersburg Wireless, the court found that the membership interests in the LLC at issue were investment contracts because "the investors had little, if any, true input in the company." 991 F. Supp. at 8. In K.F.C. Ventures, the court closely examined the operating agreement of the LLC at issue. 2000 WL 726877, at *2-*3. The operating agreement granted full managerial power to one manager, who did not have to be a member. Id. at *2. Moreover, the members' power was "limited to voting on extraordinary matters such as dissolution, . . . admission of additional members, and entering a jurisdiction which does not recognize LLCs." Id.

[4] The policy reason courts find that LLC membership interests are not securities when members have extensive managerial control was well stated by the District Court for the Southern District of New York:
> Indeed, if an investment scheme gives rise to a "reasonable expectation . . . of significant investor control, a reasonable purchaser could be expected to make his own investigation of the new business he planned to undertake and the protection of the [Exchange Act] would be unnecessary."

Keith, 48 F. Supp. 2d at 334 (quoting SEC v. Aqua-Sonic Prods. Corp., 687 F.2d 577, 585 (2d Cir. 1982)).

were not securities. Under the ARGOA, Robinson had extensive managerial responsibilities. The ARGOA vests all management responsibility in a board of managers. (ARGOA, Pl. Ex. 28, § 3.2(a).) Robinson had the power to appoint two board members, and he served as an initial board member. (Id. § 3.3(a).) Further, the board delegated extensive managerial responsibility to an executive committee. (Id. § 3.4(a).) Robinson was a member of the executive committee. (Id.) Finally, Robinson served as GeoPhone's Vice Chairman of the Board and Treasurer. (Id. § 3.5(a).) The ARGOA defines his powers as treasurer as follows:

> The Treasurer shall not be responsible for the traditional functions of a treasurer, but rather shall be responsible for approval of the selection of all external financial consultants, approval of the selection of all outside legal consultants; serve as a consultant on financial planning to the Chief Operating Officer; consult with the Chief Financial Officer on all financial matters of the Company, review status reports from the President, Chief Operating Officer and Chief Financial Officer to assess any significant variations from the Company's operating plan, and if the Treasurer feels that such significant variations are not in the best interests of the Company, may assemble the Executive Committee to discuss and determine an appropriate course of action; and shall perform such other duties as may from time to time be assigned by the Board of Managers or the President.

(Id. § 3.6(i).) Even viewed in the light most favorable to Robinson, it is clear that the ARGOA granted Robinson significant managerial authority.

Robinson's own understanding of the role he played in GeoPhone's management supports the conclusion that his interest in GeoPhone was not an investment contract. In his May 2000 deposition in another case, Robinson described his initial role in GeoPhone as: "Be the investor of the capital and be active when it comes to the high end aspect of the running of the business, all major decisions, et cetera." (Robinson Dep. of 5/30/00, Def. Ex. 32, at 15.) He also described his rights as follows:

> [T]op management could not be changed without my approval. . . . In other

> words, nothing of consequence that would affect my position adversely could be done without my prior expressed approval . . . . They couldn't sell off assets. They couldn't go and make other debt. The key would be, key personnel that were there who induced me to come in as an investor had to remain. They had certain specific duties they had to perform.

(Id. at 88-89.)

In July 1995, Robinson's lawyers wrote a letter prior to the formation of the ARGOA stating that Robinson believed he "should only relinquish his operational authority, if at all, when and if his investment is repaid to him." (Letter from Patton Boggs, LLP to Riesbach of 7/25/95, Def. Ex. 26, at ¶ B.13.) In April and August 1996, Robinson wrote letters to GeoPhone officers in which he exercised his right to disapprove disbursements to related parties and proposed licenses of the GeoPhone technology. (Letter from Robinson to Fair of 4/1/96, Def. Ex. 28; Letter from Robinson to GeoPhone Board of Managers of 8/5/96, Def. Ex. 29.) Finally, Robinson requested and received weekly status reports on all aspects of GeoPhone's business. (See Robinson Testimony in Hearing of 12/17/96, Def. Ex. 31, at 2129-31.)

Based on the powers granted Robinson under the ARGOA and Robinson's understanding of his role in GeoPhone's management, he was clearly not a passive investor. He held significant managerial authority, enabling him to protect his investment without assistance from the federal securities laws.

B.

Robinson makes three arguments to show that he was a passive investor under Howey. None are persuasive. First, he alleges that Glynn completely controlled the critical element of GeoPhone—the technological development. (Robinson Opp'n at 41-42.) According to Robinson, Glynn's control of the CAMA technology and his own lack of technological expertise

-8-

prevented him from meaningfully exercising his rights under the ARGOA. As a result, he was dependent on Glynn for the success of GeoPhone. (Robinson Surreply at 8-12.) In support of this argument, Robinson relies on Bailey, 904 F.2d at 918.

In Bailey, a district judge, adopting the opinion of a magistrate, found that a cattle breeding program was not an investment contract based on the language of the contracts creating the program. The Fourth Circuit reversed. Id. at 925. The court explained that the district court erred by considering only the contracts that created the cattle breeding program. Instead, the court should have considered the surrounding circumstances to determine if the investors actually possessed any control over the success of their investments. Id. at 922. The court found that an investment contract existed because the plaintiffs had no experience in crossbreeding and cattle embryo selection; thus, the success of the breeding program was dependent on the defendants who had the required technological expertise. Id. at 924.

The Fourth Circuit's decision in Bailey rested in large measure upon the court's earlier opinion in Rivanna Trawlers. There, Justice Powell, sitting as a circuit judge, had noted that in certain circumstances it may be necessary to examine both the partnership agreement and the surrounding circumstances of a partnership to determine if an investment contract exists. 840 F.2d at 241. As the Bailey court stated, however, Justice Powell relied on the language of a partnership agreement between the investors in Rivanna Trawlers to conclude that an investment contract did not exist: "The formal structure and protection afforded the partners under the general partnership agreement eliminated the need to apply the disclosure requirements of the federal securities laws." Bailey, 904 F.2d at 923. Only after finding that there was no formal partnership agreement to protect the cattle breeding program investors did the Bailey court

examine the ability of each investor to control the success of their investment. See id. ("Without the protections of a general partnership relied upon by the court in Rivanna, we find it appropriate to examine the ability of each individual investor to exercise ultimate control over the common enterprise.").

Bailey does not support Robinson's claim. In fact, the Bailey court's review of Rivanna Trawlers supports Glynn's contention that the GeoPhone interests are not securities. Here, like Rivanna Trawlers and unlike Bailey, Robinson has formal protections under the ARGOA. These protections, which are detailed above, allowed Robinson to exercise control over his investment. As a result, Robinson does not need to rely on the federal securities laws for protection, and his GeoPhone interests are not investment contracts.

Second, Robinson alleges that Glynn "made the essential managerial decisions which affected the failure or success of GeoPhone." (Robinson Opp'n at 42; Robinson Surreply at 5-8.) This allegation is refuted by the objective evidence. The ARGOA grants Robinson significant managerial responsibility, and Robinson has admitted that he had a powerful voice in the management of the company. In fact, Robinson's level of managerial control was much greater than that of the LLC members in the Monsanto, Keith, and Nelson cases discussed above. "This level of control is antithetical to the notion of member passivity required under the fourth prong of Howey." Keith, 48 F. Supp. 2d at 333.

Finally, Robinson argues that the parties themselves considered the GeoPhone interests securities. (Robinson Surreply at 12-15.) Robinson points specifically to language on the back

of the GeoPhone interest certificate,[5] in the APMIG,[6] and in the ARGOA.[7] Robinson's argument fails because the label parties attach to an investment does not determine whether that investment is a security. As the Eighth Circuit has stated, "It is the economic substance of the particular instrument or arrangement and not the labels used by the parties that determines whether a security is involved." Great Rivers Coop. v. Farmland Indus., Inc., 198 F.3d 685, 701 (8th Cir. 1999). As explained above, the economic substance of GeoPhone demonstrates that Robinson's investment was not an investment contract. Accordingly, I will dismiss Robinson's federal securities law claim.

III.

Robinson's only remaining claims are pendent state law claims. 28 U.S.C. § 1367(c)(3)

---

[5]The language relied on by Robinson states: "These securities may not be sold, pledged, hypothecated, donated or otherwise transferred without compliance with the registration or qualification provisions of applicable federal and state securities laws or applicable exemptions therefrom."

[6]Robinson made the following warranties in the APMIG:
E. [Robinson] acknowledges and understands that the federal and state exemptions from registration pursuant to which the Interests have been sold depend in part on each purchaser of GeoPhone's securities meeting certain requirements and, therefore, depend on the truth of his representations and warranties in this Agreement . . . .
F. [Robinson] understands that: (i) the Interests have not been registered under any federal or state securities law and cannot be sold, pledged, hypothecated or otherwise transferred without registration under applicable federal and state securities laws or meeting the conditions for exemptions therefrom . . . .
(APMIG, Pl. Ex. 27, ¶ V.E.-F.)

[7]The ARGOA requires: "The Transferring Member shall have registered the Transfer under applicable federal and state securities laws unless he delivers an opinion of counsel satisfactory to a Majority in Interest of the Members (excluding the Tranferring Member) that registration under such law is not required . . . ." (ARGOA, Pl. Ex. 28, § 7.2(b)(i).)

allows a district court to decline to exercise supplemental jurisdiction over state law claims if "the district court has dismissed all claims over which it has original jurisdiction." Thus, district courts may dismiss pendent state law claims when all federal law claims have been dismissed on summary judgment. See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."); Shanaghan v. Cahill, 58 F.3d 106, 110 (4th Cir. 1995) ("[T]rial courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished."). The factors to consider when determining whether to dismiss a state claim are: (1) convenience and fairness to the parties, (2) any underlying issues of federal policy, (3) comity, and (4) judicial economy. Shanaghan, 58 F.3d at 110.

The weight of these factors in this case suggest that I should dismiss the state law claims for securities fraud, common law fraud, and breach of contract. First, dismissing the pendent state law claims and requiring their refiling in state court will not be prejudicial or inconvenient to either party. Under Md. Rule 2-101, Robinson's state law claims can be refiled without being barred by limitations. Second, due to my schedule over the course of the next year, it is likely that the parties will be able to resolve this case—via trial or summary judgment—more quickly in state court than here. Third, Robinson knew there was a chance his state law claims would be dismissed when he filed them along with a tenuous federal securities fraud claim.

Fourth, dismissing this case will not result in a waste of judicial resources or duplicative proceedings. No new discovery or new research for the summary judgment motions is necessary

because the parties have fully briefed the state law claims. Moreover, I have no special knowledge or expertise regarding this case that a state court judge will not be able to develop in short order. I am fully aware of how long this case has been pending in federal court. However, this length of time has been due more to exigent circumstances than to the amount of judicial resources invested.[8] As a result, I find no compelling reason to keep the state law claims in federal court.

A separate order is being entered herewith.

Date: /s/ January 2, 2003

/s/ J. Frederick Motz
United States District Judge

---

[8] This case was originally filed in December 1998 and assigned to Judge Young. In November 2000, Judge Young stayed all proceedings for 120 days after Glynn filed a state court action against GeoPhone that presented a potential conflict of interest. In March 2001, Judge Young continued the stay for 90 days. In June 2001 the case was reassigned to me, and I continued the stay until June 30, 2001. In July 2001, Robinson filed a motion for leave to file a second amended complaint, which I approved in November 2001. Robinson v. Geo Licensing Co., LLC, 173 F. Supp. 2d 419 (D. Md. 2001). The parties conducted discovery and did not file their summary judgment motions and memorandum until the summer of 2002.